**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------------x

GAYLE MARTZ, INC.,                                          :

                 **Plaintiff,**                          :
                                                            :
          **-against-**                                :
                                                            :
SHERPA PET GROUP, LLC, TIM R. FORD and     :          08 Civ. 9186 (HB)
KEVIN T. SHERIDAN                                            :
                                                            :          **OPINION & ORDER**
             **Defendants.**                         :
--------------------------------------------------------------------------------x
SHERPA PET GROUP, LLC, TIM R. FORD and     :
KEVIN T. SHERIDAN,                                           :
                                                            :
        **Counterclaim/Third-Party Plaintiffs,**    :
                                                            :
          **-against-**                                :
                                                            :
GAYLE MARTZ, INC., GAYLE MARTZ,            :
**Individually and in her capacity as Officer and**    :
**Director of Gayle Martz, Inc. and SAM J. NOLE,**    :
**Individually and in his capacity as Officer and**    :
**Director of Gayle Martz, Inc.**                        :
                                                            :
        **Counterclaim Defendant and**              :
        **Third-Party Defendants.**                 :
--------------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

      Plaintiff Gayle Martz Inc. ("GMI" or "Plaintiff") brought this action on October 27, 2008

for trademark infringement and dilution, breach of contract and breach of fiduciary duty against

Defendants Sherpa Pet Group LLC ("SPG"), Tim R. Ford ("Ford") and Kevin T. Sheridan

("Sheridan") (collectively, "Defendants"), who acquired the GMI business and obtained licenses

to use the SHERPA trademarks.[1]  Defendants filed an answer and third-party complaint, joining

Gayle Martz ("Martz"), the owner of GMI, and Sam J. Nole ("Nole"), GMI's accountant

(collectively "Third-Party Defendants"), that asserted claims for professional malpractice,

fraudulent and negligent misrepresentation, breach of contract and tortious interference.

Defendants also filed counterclaims against GMI for fraudulent misrepresentation, breach of

---

[1] GMI owns a number of federally-registered trademarks, including: The Sherpa Bag®, Sherpa's Pet Trading
Company®, Kartu®, Sherpa Skyline®, Sherpa's Trading Company®, Travel First Class With Sherpa®, Su-Nae®,
Sherpa Classic Traveler®, The Sherpa Shop®, Sherpa Since 1989® and The Classic Sherpa Traveler® (collectively,
the "SHERPA trademarks").

contract and breach of the implied covenant of good faith and fair dealing.  The parties have filed cross motions for partial summary judgment.  Defendants seek summary judgment on all of GMI's claims against them; GMI seeks summary judgment on its claim for injunctive relief and Defendants' counterclaims; and the Third-Party Defendants seek summary judgment on all of Defendants' third-party claims.  For the reasons set forth below, Defendants' motion for summary judgment is denied and the consolidated motion of GMI and the Third-Party Defendants for summary judgment is granted in part.

## I.  FACTUAL BACKGROUND

GMI is a company that designed, manufactured and sold travel products for pet owners.  In connection with this business, GMI owns the SHERPA trademarks.  In early 2007, GMI hired Ford and Sheridan as CEO and CFO, respectively.  Martz then decided that she wanted to sell GMI, but that she wanted to remain involved in public relations and marketing **for** the business. She negotiated a transaction with Ford and Sheridan whereby a new company, SPG, would be formed to take over GMI's daily operations, and would license the right to use the SHERPA trademarks.  The crux of the transaction was that SPG was to acquire certain assets and assume certain liabilities, and to the extent the value of the assets exceeded the liabilities, SPG would pay for them with promissory notes to GMI.  Based on preliminary figures in March 2007, the purchase price was estimated at $500,000.

On March 30, 2007, the parties signed a Term Sheet that set forth the categories and values of the assets that SPG would acquire, and the categories and values of the liabilities it would assume.  The Term Sheet stated that "[a]ll dollar amounts . . . are as of 12/31/06 and will be adjusted to reflect the actual balances at the time of closing."  Defendants assert that they later learned that the values for assets and liabilities that they obtained from GMI's accounting system, on which they based their calculation of the purchase price, were materially inaccurate and materially overstated the value of GMI's assets by at least $1 million.

The parties agreed that they would later execute more formal documents, and that final financial statements and supporting schedules would be completed at a later date.  On April 27, 2007, documents (the "Transaction Documents") that would effectuate the transfer of assets and liabilities, the license of the right to use the SHERPA trademarks and brand name, and define the relationship between Martz and SPG going forward were signed.  At that time, the financial statements and schedules that were to accompany the Transaction Documents had not yet been completed.  Even so, the parties executed what they characterize as the "most significant" of the

Transaction Documents, the Asset Purchase Agreement ("APA"), which delineated the details of SPG's acquisition of GMI's assets and assumption of its liabilities and provided for a purchase price of $520,000 to be paid by three separate promissory notes to GMI.[2] Throughout the APA, reference was made to certain schedules that purportedly would set forth the "specific items" that would comprise the assets and liabilities that were subject to the parties' agreement; however, the schedules were largely blank or incomplete. Defendants argue that the parties agreed that the schedules would be completed by GMI before SPG's obligation to pay the purchase price would arise; however, GMI contends that to complete the schedules would have been a ministerial act that was wholly within the purview of the Defendants. The schedules were never completed, nor were the April 30, 2007 financial statements that were expressly referenced in the APA. Plaintiff contends that the financial statements could not be completed because Defendants refused to turn over books and records that would have been necessary to finalize the financial statements; Defendants, on the other hand, maintain that they turned over a copy of the entire accounting system and did not prevent GMI or its accountant from obtaining any information.[3]

The Transaction Documents included a Product License Agreement ("PLA") that sets out the terms and conditions of SPG's right to use the SHERPA trademarks on their pet travel products and a Brand License Agreement ("BLA") that sets out the terms and conditions of SPG's use of the Sherpa brand name. Each of the license agreements was for a term of 99 years and granted to SPG an exclusive license to use the Sherpa name and SHERPA trademarks. The PLA and BLA both provided for termination upon thirty days' notice in the event of a material breach of any provision, term or condition in the agreements by SPG. Upon termination, SPG was to cease using the marks and/or brand name "as soon as is commercially feasible." The PLA and BLA provided for royalty fees to be paid to GMI and required SPG to submit to GMI written monthly reports that summarized the total net sales of products sold for that month, along with the corresponding royalty payments owed to GMI.

In approximately May 2008, Defendants ceased making any payments to GMI, including interest payments on the promissory notes or royalty payments under the PLA and BLA. They

---

[2] Note A, in the amount of $345,000, was to be paid by SPG to GMI within 90 days of GMI providing the final financial statements for the period ending April 30, 2007. Note B, in the amount of $20,000, was to be paid within 180 days of GMI providing the final financial statements. Note C, in the amount of $155,000, was to be paid within 31 months after GMI's debt to another secured creditor (Jong Lih USA) was paid in full.

[3] There also appears to be some disagreement between the parties as to whose responsibility it was to prepare the schedules to the APA: Plaintiff claims it was Defendants' responsibility, while Defendants contend that GMI was to complete the financial statements, from which the schedules to the APA would be completed.

also ceased to produce to GMI the sales reports they were obligated to provide under the PLA and BLA.  As a result, on September 12, 2008, GMI sent a letter to SPG giving notice of its intent to terminate the PLA and BLA, stating that the agreements would terminate thirty days from the date of the letter.  Defendants made no attempt to cure their default, and continued to use the SHERPA trademarks and brand name following the official termination of the agreements in October 2008.

## II.  LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004); *see also Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (finding party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").  Rather, he "must come forward with evidence sufficient to allow a reasonable jury to find in [his] favor."  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, . . . the adverse party's response . . . must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added).  The facts must be presented in a form that would be admissible at trial.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*

### III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.      Breach of the APA**

    *1.      Parties' Intent Regarding a Purchase Price Adjustment*

Defendants' main argument in support of their motion for summary judgment is that they cannot be liable for their failure to pay the purchase price under the APA (and, presumably, for their failure to pay on the promissory notes) because their payment obligation never arose. Specifically, Defendants argue that, as evidenced by the Term Sheet and other pre-APA negotiations among the parties, the parties' intent was to adjust the purchase price after the financial statements were finalized and the schedules to the APA were updated.  In sum, Defendants contend that the parties intended that the adjustment of the purchase price, as based on the schedules and financial statements, was a condition precedent to their payment obligation under the APA.  GMI argues principally that the parties' intent should be gleaned from the APA without regard to extrinsic evidence, and the APA nowhere contains language relating to a readjustment of the purchase price.  Rather, GMI's position is that the APA shows the parties' intent that the purchase price stated in the agreement would be paid, and all assets would be acquired and all liabilities assumed, without any adjustment after the closing.  GMI also contends that, although it is clear from the unambiguous language of the APA that the completion of the financial statements was intended to be a condition precedent, Defendants cannot rely on the failure of that condition because they acted to prevent its completion.

Under New Jersey law,[4] the Court's goal in interpreting a contract is "to ascertain the intention of the parties."  *Driscoll Constr. Co., Inc. v. New Jersey*, 371 N.J. Super. 304, 313 (App. Div. 2004).  In determining that intent, courts are instructed to "consider many factors, including the document itself and the surrounding circumstances."  *K. Woodmere Assocs., L.P. v. Menk Corp.*, 316 N.J. Super. 306, 316 (App. Div. 1998).  The interpretation or construction of a contract is usually a legal question for the court that is suitable for a decision on summary judgment; however, "where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury."  *Id.* at 313-314; *Great Atl. & Pac. Tea Co., Inc. v. Checchio*, 335 N.J. Super. 495, 502 (App. Div. 2000); *see also Jaasma v. Shell Oil Co.*, 412 F.3d 501, 507 (3d Cir. 2005) (applying New Jersey Law).  New Jersey takes an expansive view on the parol evidence rule, and allows consideration of extrinsic evidence to help

---

[4] The parties have stipulated that, pursuant to the choice-of-law provisions of the Transaction Documents, New Jersey law applies to all claims that arise out of the contracts.

ascertain the parties' intent, even when the contract is unambiguous.  *E.g.*, *Checchio*, 335 N.J. Super. at 501 (quoting *Atlantic N. Airlines, Inc. v. Schwimmer*, 12 N.J. 293 (1953)); *Dontzin v. Myer*, 301 N.J. Super. 501, 507 (App. Div. 1997).  Indeed, as the New Jersey Supreme Court recently held, courts are permitted "a broad use of extrinsic evidence" to "uncover the true meaning of contractual terms."  *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 270 (2006).  However, extrinsic evidence may not be used to contradict or vary an otherwise unambiguous contract.  *E.g.*, *id.*; *Dontzin*, 301 N.J. Super. at 507.

In this case, the APA states a specific purchase price of $520,000 and also makes explicit reference to certain schedules that were to contain the "specific" assets to be acquired and liabilities to be assumed.  Defendants assert that, once the Court views the totality of the circumstances, including extrinsic evidence such as the Term Sheet, it is clear that the parties intended to adjust the stated purchase price once the schedules were finalized.  Although GMI argues that the language of the contract setting forth the purchase price and the lack of a provision for readjustment are unambiguous, this contention alone does not preclude the Court from consulting extrinsic evidence to determine the parties' intent, so long as that extrinsic evidence does not work to vary or contradict the terms of the contract.  *See Conway*, 187 N.J. at 270; *Checchio*, 335 N.J. Super. at 501.

GMI also contends that consideration of extrinsic evidence is precluded due to an integration clause in the APA.[5]  Defendants, relying on *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 N.J. Super. 485 (App. Div. 1963), argue that the integration clause must be ignored, as they are considered under New Jersey law to be void as contrary to public policy.  Defendants appear to misinterpret the holding of *Garden State* in this regard.  In that case, the court considered the effect of an integration clause that, among other things, precluded the consideration of "previous negotiations, arrangements, agreements and understandings . . . [to] be used to interpret or construe this lease."  The court found that this clause, if given effect, would forbid the use of any negotiation materials in construing the lease.  *Garden State*, 78 N.J. Super. at 500.  Thus, the court found in effect that the integration clause, if given effect, would preclude it from considering extrinsic evidence to determine the *intent* of the parties, which runs contrary to established New Jersey law, as discussed above.  The merger clause at issue in this case, on the

---

[5] Specifically, the section 22 of the APA provides: "This Agreement constitutes the entire agreement between Seller and Purchaser, and supersedes any prior understanding or representation of any kind preceding the date of this Agreement.  There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement."

other hand, does not expressly preclude the Court from following New Jersey's law with respect to the consideration of extrinsic evidence to determine *intent* with respect to the APA, it merely precludes the Court from considering any *different* or *contradictory* agreements prior to the execution of the APA.  Although the difference is subtle, it is significant here.  Indeed, this result is buttressed by the fact that numerous courts have found, post-*Garden State*, that merger clauses may be considered in determining the parties' intent in drafting a contract.  *See, e.g.*, *S. Megga Telecommc'ns Ltd. v. Lucent Techs., Inc.*, No. 96-357-SLR, 1997 U.S.Dist. LEXIS 2312, at *22-23 (D.N.J. Feb. 14, 1997); *In re Steel Wheels Transport, LLC*, No. 06-15377 (DHS), 2009 Bankr. LEXIS 998, at *13 (D.N.J. Bankr. Jan. 29, 2009).

 However, GMI's contention that the merger clause is conclusive evidence that the contract is fully integrated likewise does not comport with the case law.  Although courts applying New Jersey law have taken different approaches to the question of whether an integration clause such as the one at issue in this case precludes entirely the consideration of extrinsic evidence, it appears that the majority approach is that "[a]lthough a contract with a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them, it is not dispositive."  *S. Megga*, 1997 U.S. Dist. LEXIS 2312 at *22-23.  Moreover, the existence of an integration clause "alone does not change the determination of whether ambiguous language exists."  *In re Steel Wheels*, 2009 Bankr. LEXIS 998 at *13.

 Here, although there is an integration clause, express reference to schedules that were left blank creates an inherent ambiguity as to the parties' intent with respect to the purchase price to be paid under the APA.  When the extrinsic evidence is viewed with an eye toward understanding the parties' intent, in conjunction with the existence of blank schedules that were referred to in the APA as containing the "specific" assets and liabilities that were the subject of the parties' agreement, there is a genuine question of material fact as to whether the parties might have intended that the purchase price would be readjusted under an updated valuation of assets and liabilities, which were to be included on the schedules and the completed financial statements.  As a consequence, there is a genuine issue of material fact as to whether the parties intended that the completion of the APA schedules was to be a condition precedent to Defendants' payment obligation under the APA.[6]  Another issue of material fact is whose responsibility it was to

---

[6] The Court cannot agree with Defendants that it can decide, as a matter of law on summary judgment, that it was in fact the parties' intent to incorporate a provision for a post-closing readjustment of the purchase price.  There are simply too many questions as to whose interpretation of the APA and Term Sheet is in fact what the parties intended, and under New Jersey law, these questions must be left to the jury.

complete the schedules and financial statements in the first instance.[7]   There are still other issues that require a denial of Defendants' motion for summary judgment on GMI's claim for breach of the APA insofar as it is premised on the argument that their payment obligation never arose.

       2.    *Breach of Warranty Regarding Unencumbered Assets*

Defendants also advance an alternative argument that they contend avoids liability under the APA: Defendants argue that their non-performance under the APA was excused because GMI breached one its warranties, i.e., GMI warranted that it had clean title to all assets and that all assets would be unencumbered at closing; Defendants contend that this warranty was breached because all of GMI's assets were subject to a lien held by Banco Popular.  Strangely, given its position regarding the integration clause in the APA, GMI contends that there was an "unwritten understanding" prior to the execution of the APA that, notwithstanding the language of the warranty, all assets were subject to the Banco Popular lien.  The clear and unambiguous language of the integration clause states that "[t]here are no other promises, conditions, *understandings* or other agreements, whether oral or written, relating to the subject matter of [the APA]."  To allow GMI to use this purported unwritten "understanding" would contradict the express language of the Representations and Warranties and contradict not only its own interpretation of the integration clause, but the fundamentals of New Jersey law with respect to the parol evidence rule and the consideration of extrinsic evidence.  Thus, GMI cannot rely on this unwritten understanding to oppose Defendants' motion.

Alternatively, GMI argues that, even if it had breached the Representation and Warranty as to the Banco Popular lien, such a breach would give rise only to a cause of action for breach, and not an excuse for Defendants' non-performance.  While GMI's argument is likely incorrect, I am not prepared to determine as a matter of law that the existence of the Banco Popular lien was so material as to excuse Defendants' performance under the APA; rather, the question of whether the existence of the encumbrance on GMI's assets was material should be left to the jury.  Accordingly, Defendants' motion for summary judgment in that regard is denied.

---

[7] This problem is evocative of the old adage, "which came first, the chicken or the egg?"  Here, Defendants contend that the financial statements, which were to be completed by GMI, were needed to be able to complete the APA schedules.  GMI, on the other hand, contends that the creation of the schedules was a clerical act that was within the control of the Defendants, and that the completion of the schedules was what was required for GMI to complete the financial statements.  This kind of dispute on the facts and responsibilities of the parties is precisely the kind of issue that this Court cannot resolve on summary judgment.

**B.      Breach of the PLA and BLA**

Defendants also move for summary judgment on GMI's claims for breach of the PLA and BLA because they contend that GMI is unable to provide a calculation of its damages under those two contracts.  Defendants argue that in GMI's initial disclosures, it asserted that its damages would depend on figures to be acquired from SPG's accounting system and royalty statements obtained in discovery.  Defendants contend, without citation to any legal authority, that because GMI never supplemented its initial disclosures or interrogatory responses after obtaining that discovery, that GMI should be precluded from putting forth any evidence of damages.  GMI counters that, because all of the information that supports its damages calculation was obtained from the Defendants, it was known to Defendants during discovery and GMI was not required under Rule 26(e)(1)(A) to supplement its disclosures or interrogatories.

Under Rule 26(e)(1)(A), "[a] party who has made a disclosure under Rule 26(a) – or who has responded to an interrogatory, request for production, or request for admission – must supplement or correct its disclosure or response . . . in a timely many *if* the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and* if the additional corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Rule 37(c) of the Federal Rules of Civil Procedure provides that where "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "Notwithstanding the seemingly mandatory language of the rule, even where the failure to disclose is neither 'justifi[ed]' nor 'harmless,' the Second Circuit has viewed the imposition of sanctions as discretionary and district courts have generally not ordered preclusion."  *See Mahoney v. Keyspan Corp.*, No. CV 04-554, 2007 U.S. Dist. LEXIS 41214, at *2 (E.D.N.Y. June 6, 2007)(citing, *inter alia, Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297-98 (2d Cir. 2006)). Here, any corrective information that GMI might have provided in supplements to its discovery responses was at all times known to Defendants – indeed, any such supplements would be derived entirely from discovery materials that Defendants produced to GMI.  Thus, GMI's not having supplemented its discovery responses caused no prejudice to Defendants, and the Court has no occasion to sanction GMI for any discovery misconduct, especially not the drastic sanction of preclusion that Defendants seek here.  Accordingly, this aspect, too, of Defendants' motion for summary judgment is denied.

**C.     Breach of Fiduciary Duty**

Finally, Defendants move for summary judgment on GMI's claims against Ford and Sheridan for breach of fiduciary duty because "Sheridan was an outside contractor and thus was not subject to such a fiduciary duty" and "GMI has advanced no evidence that Ford engaged in any wrongful conduct."[8]   A fiduciary duty "exists between two persons when one of them is under a duty to act or to give advice for the benefit of another upon matters within the scope of the relation."  *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19 (2005).  A fiduciary is prohibited from "acting in any manner inconsistent with his agency or trust" and is "at all times bound to exercise the utmost good faith and loyalty in the performance of his duties."  *Gortat v. Capala Bros., Inc.*, 585 F. Supp. 2d 372, 376 (S.D.N.Y. 2008) (quoting *Lamdin v. Broadway Surface Adver. Corp.*, 272 N.Y. 133, 138 (1936)).  Whether a fiduciary relationship exists is a fact-specific inquiry.  *See EBC I*, 5 N.Y.3d at 19.  Here, contrary to Defendants' contentions, the fact that an individual is labeled an independent contractor "does not defeat the existence of a fiduciary duty where one would otherwise exist."  *Pergament v. Roach*, 41 A.D.2d 569, 571 (2d Dep't 2007); *see also JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 08 Civ. 9116 (PGG), 2009 U.S. Dist. LEXIS 9207, at *34 (S.D.N.Y. Feb. 9, 2009).  Thus, there is no merit to Defendants' argument as it relates to Sheridan.  With respect to the fiduciary duties claim against Ford, Plaintiff has raised genuine material factual questions as to whether he and Sheridan stalled the collection of outstanding accounts receivable, and whether they acted in any way to devalue GMI's intellectual property.  Accordingly, Defendants' motion for summary judgment on this claim, too, is denied.

## IV.  MOTION OF GMI AND THIRD-PARTY DEFENDANTS FOR SUMMARY JUDGMENT

GMI cross-moves for summary judgment seeking (a) a permanent injunction against Defendants' continued use of the SHERPA trademarks; (b) dismissal of all third-party claims as procedurally improper under Rule 14(a) of the Federal Rules of Civil Procedure; and (c) dismissal of all claims against GMI and Third-Party Defendants as legally deficient.

**A.     Termination of the PLA and Defendants' Continued use of the SHERPA Trademarks**

GMI's argument in support of its motion for summary judgment on its claim for permanent injunctive relief with respect to its trademark infringement claim is premised on its contention that

---

[8] Defendants appear to have abandoned their argument on this claim in their reply brief, and I therefore need not address it.  *See Weissman v. Fruchtman*, 765 F. Supp. 1185, 1193 (S.D.N.Y 1991).  However, for the sake of completeness, I will address the merits of Defendants' argument.

it properly terminated the PLA, and that Defendants' continued use of the SHERPA trademarks after the termination of the PLA constituted trademark infringement and must be enjoined.[9]  I agree.

1.      *Termination of the PLA*

Under paragraph 2(b) of the PLA, GMI has the right to terminate the agreement if SPG materially breaches a material provision, term or condition of the contract.  Paragraph 3(b) provides that "[f]ailure to submit Monthly Reports or to make Monthly Royalty Payments within the time allotted above shall be considered a Property breach of this agreement."[10]  It is undisputed that in May 2008, Defendants stopped making any royalty payments or submitting any monthly sales reports to GMI.  Plaintiff contends these failures were material breaches of the PLA that justified a termination under paragraph 2(b).  A breach is material "if it goes to the essence of the contract."  *Williams v. Van Riemsdijk*, Docket No. A-5770-06T1, 2008 N.J. Super. Unpub. LEXIS 262, at *8 (App. Div. July 21, 2008) (quoting *Ross Sys. V. Linden Dari-Delite, Inc.*, 35 N.J. 329, 341 (1961)).  As noted above, whether a breach of contract is material generally is an issue of fact for the jury.  However, "as is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer . . . , then the court must intervene and address what is ordinarily a factual question as a question of law."  *Norfolk*, 512 F.3d at 92.  Here, the very purpose of the PLA was to license the use of the SHERPA trademarks to SPG, and in return SPG was to provide royalty statements and payments to GMI on a specified schedule.  Thus, the only reasonable interpretation is that SPG's failure to perform these essential obligations constituted a breach, and that GMI was justified in terminating the PLA under paragraph 2(b) of the contract.  To hold otherwise would turn the law on its head.

Defendants contend they were entitled to a setoff.  Even if that argument had some merit, which is at best problematical, there is nothing in the language of any of the Transaction

---

[9] In its reply brief, GMI briefly notes that the BLA contained an identical termination provision, and that all of the arguments GMI has advanced as to why its termination of the PLA was proper apply equally to its termination of the BLA.  Thus, GMI states in its reply that while "GMI is content to wait until trial to litigate its claims under the BLA," summary judgment should be granted on the BLA claim as well.  However, GMI nowhere expressly moves for summary judgment on its BLA claim, and it cannot belatedly advance these arguments in its reply brief, when Defendants will have had no opportunity to address them.  Accordingly, the Court declines the invitation to grant summary judgment on the GMI's claim for breach of the BLA *sua sponte*, and GMI will need to present the same arguments to the jury.

[10] GMI contends that the use of the word "Property," a defined term in the PLA, in this sentence was a mistake, and that the parties clearly intended to agree that such a failure would constitute a "material" breach.  This hidden intent is not clear from the language of the PLA, and therefore the Court cannot resolve this question on summary judgment.  However, as will be explained further below, this question is not determinative of GMI's motion on this claim.

Documents, or in any other extrinsic evidence that the parties have submitted that might bear on the parties' intent to excuse payments under one contract when there is a possibility of an offset against payments made under another.  Indeed, it is difficult for the Court to comprehend Defendants' arguments in favor of a setoff, as it is undisputed that no payments were ever made under the APA; thus, it appears impossible for Defendants to be entitled to a setoff as a matter of undisputed fact.  It is possible, however, that Defendants have meant to argue that any payments for which they might be liable under the PLA should be offset against the damages to which they may potentially be entitled for their counterclaims of fraud or breach of contract in this action.  If indeed Defendants do make this argument (which is not altogether clear from their briefs), it is well-established that the fact that Defendants may be able to recover from Plaintiff on their counterclaims, and that such recovery may ultimately be offset against damages Defendants owe under the PLA, does not preclude the court from determining on summary judgment that GMI properly terminated the PLA.  *See, e.g.*, *Wexco Indus. V. ADM21 Co., Ltd.*, No. 04-5244 (JLL), 2008 U.S. Dist. LEXIS 104766, at *57-58 (D.N.J. Dec. 30, 2008); *Mack Boring & Parts Co. v. Novis Marine, Ltd.*, No. 06-2692 (HAA), 2008 U.S. Dist. LEXIS 71239, at *23-25 (D.N.J. Sept. 18, 2008); *Kurz-Kasch, Inc. v. Holtzberg*, Civ. No. 05-519 (GEB), 2006 U.S. Dist. LEXIS 8834 (D.N.J. Mar. 7, 2006); *Electro-Catheter Corp. v. Surgical Specialties Instr. Co., Inc.*, 587 F. Supp. 1446 (D.N.J. 1984).[11]

Defendants' second argument fares no better.  They argue in the alternative that GMI acted in bad faith in terminating the PLA "immediately" without entertaining an inquiry into the status of payments and without giving SPG an opportunity to cure its default.  Defendants' argument in this regard is controverted by the undisputed facts.  To wit, GMI's letter of September 12, 2008 provided SPG with 30 days' notice of the official termination of the PLA, as required under the express terms of the agreement; thus, it cannot be said that any termination was "immediate" or abrupt by any measure.  Second, although it is undisputed that the PLA contained no provision that required GMI to give SPG an opportunity to cure any default, it is likewise undisputed that SPG made no move during the 30-day termination period even to attempt to cure its defaults.

---

[11] To reach the same result, GMI cites to three cases, none of which is on point.  *See Falkenstern v. Herman Kussy Co.*, 137 N.J.L. 200 (N.J. Ct. Err. 1948) (interpreting statute that provides for offset of two liquidated claims; finding that unliquidated claim cannot be offset against liquidated claim); *Godkin v. Bailey*, 74 N.J.L. 655 (N.J. Ct. Err. 1907) (same); *Corson v. Bailey*, 98 N.J. Eq. 323 (N.J. Ct. Err. 1925) (finding claim for unliquidated damages cannot be used as setoff to foreclosure action).  While these cases are apparently inappose here, there are numerous cases, cited above, that find that a potential setoff of damages does not preclude summary judgment where no factual issues remain as to liability.

Accordingly, SPG's arguments fail to raise a genuine issue of material fact as to whether GMI properly terminated the PLA upon SPG's breach.

      2.     *Trademark Infringement and Permanent Injunction Standard*

Having determined that GMI properly terminated the PLA, the Court turns to whether SPG has raised a genuine issue of material fact and whether GMI has established its entitlement to a permanent injunction. I find that SPG has failed to bear its burden in this regard.

It is well-settled that when a licensee's authority to use a trademark has been terminated, any further use of the trademark constitutes trademark infringement and may be enjoined. *See, e.g.*, *E.G.L. Gem Lab Ltd. v. Gem Quality Inst., Inc.*, 90 F. Supp. 2d 277, 293 (S.D.N.Y. 2000); *Hard Rock Café Int'l (USA) Inc. v. Morton*, 97 Civ. 9483 (RPP), 1999 U.S. Dist. LEXIS 8340, at *93-94 (S.D.N.Y. June 2, 1999); *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983); 4 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 25:31 (4th ed. 2009); *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) (finding when a former licensee continues to use a mark after authority has expired, "the potential for consumer confusion is greater than in the case of a random infringer"). Here, it is undisputed that Defendants continued to use the SHERPA trademarks after GMI properly terminated the PLA; indeed, it is undisputed that they continue to use the marks to this day. Accordingly, GMI is entitled to summary judgment on its claim for trademark infringement.[12]

Defendants argue that, even if the PLA were properly terminated, GMI has not shown its entitlement to a permanent injunction. Specifically, Defendants contend that GMI has failed to make the requisite showing under the standard for permanent injunctive relief set forth by the Supreme Court in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). In *eBay*, a patent infringement case, the Court held that a plaintiff must demonstrate four elements before a court may grant a permanent injunction: (1) irreparable injury; (2) inadequacy of remedies at law; (3) the balance of the hardships weighs in favor of an injunction; and (4) the public interest would not be disserved by a permanent injunction. *Id.* at 392. Based on a review of the post-*eBay* cases in this Circuit, it is not clear whether this newly enunciated standards is properly applied in trademark infringement actions such as the instant case – the Second Circuit has not spoken on the

---

[12] Indeed, Defendants do not appear to contend otherwise. In their opposition to GMI's motion for summary judgment, their argument is premised solely on the contention that the PLA was not properly terminated. However, they do not advance any argument that, in the event the Court determines that the PLA was validly terminated (as it has done), that Defendants are not necessarily liable for trademark infringement.

issue, and the district courts that have addressed the issue have been split.  *Compare Microsoft Corp. v. AGA Solutions, Inc.*, 589 F. Supp. 2d 195, 204 (E.D.N.Y. 2008) (applying *eBay* standard in trademark infringement action) *with Patsy's Italian Restaurant, Inc. v. Banas*, 575 F. Supp. 2d 427, 464 & n.25 (E.D.N.Y. 2008) (expressly declining to apply *eBay* standard where Second Circuit has not held that it applies to trademark actions and post-*eBay* cases have applied previously existing standard) (citing *L. & J.G. Stickley, Inc. v. Cosser*, 255 Fed. Appx. 541, 543 (2d Cir. 2007)).  Thus, some courts continue to apply the pre-*eBay* standard in trademark infringement cases, which requires only that a party seeking a permanent injunction "must succeed on the merits and show an absence of an adequate remedy at law and irreparable harm if the relief is not granted."  *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006); *Chloe v. DesignersImports.com USA, Inc.*, 07-CV-1791 (CS)(GAY), 2009 U.S. Dist. LEXIS 42351, at *34 (S.D.N.Y. Apr. 29, 2009); *Protection One Alarm Monitoring, Inc. v. Executive Protection One Sec. Serv., LLC*, 553 F. Supp. 2d 201, 205 (E.D.N.Y. 2008).

I need not decide in this case whether the "slightly more stringent standard for issuing a permanent injunction," *Patsy's Italian Restaurant*, 575 F. Supp. 2d at 464 n.25, set forth in *eBay* should be applied in this trademark action, because even if it does apply, GMI has satisfied its burden to show it is entitled to the relief it seeks.  Here, GMI has shown actual success on the merits and irreparable injury, since "[t]he unauthorized use of a mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark."  *Church of Scientology*, 794 F.2d at 43.  Second, GMI has demonstrated that it has no adequate remedy at law, since "there is no assurance in the record against defendant[s'] continued violation of plaintiff's . . . trademarks."  *Microsoft Corp. v. ATEK 3000 Computer Inc.*, 06 CV 6403 (SLT) (SMG), 2008 U.S. Dist. LEXIS 56689, at *16 (E.D.N.Y. July 23, 2008).  Moreover, GMI's demonstration of irreparable harm necessarily demonstrates the inadequacy of legal remedies.  *Id.* (citing *Northwestern Nat'l Ins. Co. of Milwaukee, Wis. V. Alberts*, 937 F.3d 77, 80 (2d Cir. 1991)).  The balance of the hardships weighs in GMI's favor because the only hardship that will befall Defendants in this case is the imposition of an obligation to comply with the law, while GMI faces continued loss of goodwill and ability to exploit the trademarks that GMI itself owns if an injunction does not issue.  Finally, the public interest lies in the enforcement of the Acts of Congress, "especially the prevention of consumer confusion" as espoused by the Lanham Act.  *Id.* at *17.  Accordingly, GMI is entitled to permanent injunctive relief.

**B.      Third-Party Claims against Martz and Nole**

The Third-Party Defendants also seek summary judgment on all of Defendants' third-party claims against Martz and Nole, based on the argument that these claims are improper under Rule 14(a) of the Federal Rules of Civil Procedure.  Generally, Rule 14(a) permits a defending party to implead another party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."  Fed. R. Civ. P. 14(a).  The impleader action must be dependent on, or derivative of, the main claims – that is, on the plaintiff's claim against the defendant/third-party plaintiff.  *See Bank of India v. Trendi Sportswear, Inc.*, 239 F.3d 428, 438 (2d Cir. 2000); *Kenneth Leventhal & Co. v. Joyner Wholsale Co.*, 736 F.2d 29, 31 (2d Cir. 1984) ("[T]he third party's liability [must be] dependent upon the outcome of the main claim [or] the third party [must be] potentially secondarily liable as a contributor to the defendant."); *Doucette v. Vibe Records, Inc.*, 233 F.R.D. 117, 120 (E.D.N.Y. 2005).  Thus, "Rule 14 provides a procedural mechanism whereby a defendant can have derivative, contingent claims against others not originally parties to the action adjudicated contemporaneously with the claims against it: it does not create new substantive rights against those other parties."  *Crews v. County of Nassau*, 612 F. Supp. 2d 199, 203-04 (E.D.N.Y. 2009).

Generally, the traditional grounds for an impleader action are indemnification, contribution or subrogation; however,

> regardless of the type of claim asserted, the third party must necessarily be liable over to the defendant for all or part of the plaintiff's recovery, or the defendant must attempt to pass on to the third party all or part of the liability asserted against the defendant. In other words, the outcome of the third-party claim must be contingent on the outcome of the main claim.

*Doucette*, 233 F.R.D. at 120.  Thus, the relationship between a defendant and third-party defendants is similar to one of joint tortfeasor; if the third-party is more akin to a joint tortfeasor with the plaintiff rather than the defendant, the claim is not a proper impleader claim.  *See, e.g.*, *EZ-Tixz, Inc. v. Hit-Tix, Inc.*, 93 Civ. 3791 (CSH), 1995 U.S. Dist. LEXIS 2183, at *12-16 (S.D.N.Y. Feb. 27, 1995).  A third-party complaint "is a narrow device and cannot be used to bring in other matters that may have some relationship to the case."  *Id.*; *see also Schwabach v. Memorial Sloan-Kettering Cancer Ctr.*, 99 Civ. 1320, 2000 U.S. Dist. LEXIS 797, at *8 (S.D.N.Y. Jan. 31, 2000) ("An entirely separate and independent claim cannot be maintained against a third party under Rule 14, even though it arises out of the same general set of facts as the main claim.").  One factor to consider in determining whether the third-party claims are proper, or

15

whether they are separate and independent claims, is to look at the relief sought in the third-party complaint. *See Electra Entm't Group Inc. v. Santangelo*, 06 Civ. 11520 (SCR) (MDF), 2008 U.S. Dist. LEXIS 11845, at *11 (S.D.N.Y. Feb. 15, 2008); *Doucette*, 233 F.R.D. at 120.

  In this case, Defendants bring claims against Martz and Nole purportedly under Rule 14(a) for accountant liability, fraud, negligent misrepresentation, breach of contract and tortious interference.  An examination of the substance of these claims, as set forth in the third-party complaint, reveals that although they may arise out of the same general set of facts as the main claims brought by GMI against Defendants, there is no arguable basis that they are derivative to the main claims.  Rather, they assert wholly separate substantive claims.  That is, the relationship of Martz and Nole to this action is more akin to joint wrongdoers with GMI than with SPG.[13] Moreover, the relief Defendants seek, which includes damages for breach of contract and punitive damages, makes it clear "that Defendants are not attempting to pass on all or part of the liability asserted by the Plaintiff, but seek affirmative and equitable relief above and beyond the relief sought by the Plaintiff." *Doucette*, 233 F.R.D. at 120.  Accordingly, SPG's claims against Martz and Nole are improper under Rule 14(a) and must be dismissed.[14]

**C.**  **Claims of Fraudulent Misrepresentation and Breach of APA**

  As the Court has determined that all of the claims against Martz and Nole are procedurally improper, I need not address the merits of the motion for summary judgment on those claims. However, GMI also moves for summary judgment on the few counterclaims that Defendants have asserted against it – namely, fraudulent misrepresentation, breach of the APA and breach of the duty of good faith and fair dealing.  I find that there are genuine issues of material fact that preclude summary judgment on these claims.  For example, with respect to the fraud claim, factual questions remain as to whether Defendants relied on any representations made by GMI, and whether any such reliance was reasonable and justifiable.  Likewise, with respect to the claims for

---

[13] In opposition to summary judgment, Defendants take the tenuous position that their liability on the main claims is connected to the Third-Party Defendants' potential liability to them on the third-party claims.  However, none of these allegations is contained in the third-party complaint, nor do Defendants cite any legal basis for finding this contributory relationship.

[14] Alternatively, Defendants suggest that the court should deem their joinder of Martz and Nole to have been accomplished pursuant to Rule 20, rather than Rule 14.  Rule 20 permits joinder of plaintiffs where the party seeking joinder "assert[s] any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "and any question of law or fact common to all plaintiffs will arise in the action."  Fed. R. Civ. P. 20(a)(1).  However, Defendants have made no such motion for permission to join Martz or Nole as plaintiffs, and they cannot do so now in their opposition to summary judgment. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (finding a "party may not amend [its] pleading through statements in [its] briefs"); *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 436 (S.D.N.Y. 2003) (same).

breach of contract and breach of the implied covenant of good faith and fair dealing, as discussed in detail above, there are numerous remaining genuine issues of material fact that surround the parties' contractual relationship. These include: whether any party was prevented by the other from satisfying a condition precedent to the APA, whether the accounting information over which GMI contends Defendants had complete control was materially inaccurate, whether the Banco Popular lien on all of GMI's assets constituted a material breach of the contract and whether GMI provided materially false financial information or otherwise prevented Defendants from enjoying the fruits of the APA. Accordingly, GMI's motion for summary judgment on Defendants' counterclaims is denied, and truth be told the plaintiff's attorney should know better than to have moved for summary judgment on these facts.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The consolidated motion of GMI and the Third-Party Defendants is GRANTED to the extent discussed in this opinion. This matter will proceed to trial as scheduled on September 29, 2009 on the following claims:

- GMI's claim against SPG for trademark dilution
- GMI's claim against SPG for damages arising from its breach of the PLA
- GMI's claim against SPG for breach of the BLA
- GMI's claim against SPG for breach of the APA
- GMI's claim against SPG for non-payment of Note A
- GMI's claim against SPG for non-payment of Note B
- GMI's claim against Ford and Sheridan for breach of fiduciary duties
- Defendants' counterclaim against GMI for fraudulent misrepresentation
- Defendants' counterclaim against GMI for breach of the APA
- Defendants' counterclaim against GMI for breach of the implied duty of good faith and fair dealing.

GMI is directed to submit a proposed order for a permanent injunction, on notice to the Defendants, within twenty (20) days of the date of this opinion and order. The clerk is instructed to close these motions (Docket Nos. 18 and 23) and remove them from my docket.

**IT IS SO ORDERED.**

New York, New York
August    , 2009

_____
U.S.D.J.

17